## UNITED STATES *v.* ELLIOTT.

### APPEAL FROM THE COURT OF CLAIMS.

No. 37. Argued October 19, 1896. — Decided November 30, 1896.

A tract of land in South Carolina was sold in 1863 under the direct tax acts for non-payment of the direct tax to the United States, and was bid in by the United States. It was then subdivided into two lots, A and B. Lot A, the most valuable, was resold at public auction to E who had a life estate in it, and it was conveyed to him. Lot B was also resold, but the present controversy relates only to Lot A. This lot was purchased by a person who had been a tenant for life of the whole tract before the tax sale. After the purchase and during his lifetime it was seized under execution and sold as his property. No part of the property has come

into the possession of the remaindermen, claimants in this action, nor have they repurchased or redeemed any part of it from the United States, nor has any purchase been made on their account. Under the act of March 2, 1891, c. 496, 26 Stat. 822, they brought this suit in the Court of Claims to assert their claim as owners in fee simple in remainder, and to recover one half of the assessed value of the tract. *Held*, that as they were admittedly owners, as they themselves neither purchased nor redeemed the land, and as they are not held by any necessary intendment of law to have been represented by the actual purchaser, they are entitled to the benefit of the remedial statute of 1891.

The facts of the case, as found by the Court of Claims, were as follows:

On March 13, 1863, block 91, in the town of Beaufort, South Carolina, was sold by the United States direct tax commissioner for South Carolina, under the direct tax acts, act of August 5, 1861, c. 45, § 8, 12 Stat. 292, 294; act of June 7, 1862, c. 98, 12 Stat. 422, to satisfy a tax, with penalty and interest, of $127.42 assessed against it, and was bid in by the United States. Said block was assessed for taxation by the said commissioner at $10,000. Subsequently it was divided into two lots, viz., lot A, containing buildings, and measuring on the north line 103 feet; and lot B, measuring on the north line 207½ feet.

Lot A was resold November 1, 1866, at public auction, to T. R. S. Elliott for $200, and conveyed to him. Lot B was resold at public auction to Thomas M. S. Rhett for $225. At the time of the said sale for taxes the titles in lots A and B, save so much thereof as lies west of a line drawn parallel to the west line of lot A 103 feet west therefrom, were vested in T. R. S. Elliott as tenant for life, with remainder in fee in Alfred, William, Phœbe, Ann C., James C., Arthur H., Isabella R., Seignley C., Montrose and Apsley H. Elliott, children of the said T. R. S. Elliott. The said Apsley H. Elliott died in the year 1867, and the other mentioned children are his heirs at law. The said Thomas R. S. Elliott died in 1876. The surviving children, who are the claimants, were of tender years during the late civil war. The value of that part of block 91 owned by the claimants is twenty-nine thirtieths of the whole value of said block.

Thomas R. S. Elliott, the tenant for life, adhered to the cause of the rebellion, and on the occupation of Port Royal by the Union troops in November, 1861, left St. Helena Island, with all the population of those islands, and remained away until after the close of the war. During the entire period of his absence St. Helena Island and the adjacent islands were occupied by United States troops and had been entirely abandoned by the original inhabitants. After the purchase, in November, 1866, by T. R. S. Elliott, the property was seized under execution and sold as his property. Subsequently the purchaser of the property at sheriff's sale handed to the widow of T. R. S. Elliott the value of her dower in the property. No part of the property has come into the possession or ownership of the claimants, or any one of them, through the said T. R. S. Elliott. The claimants have not repurchased or redeemed any part of said property from the United States, nor has any purchase been made or intended to be on their account.

On this state of facts the Court of Claims found that the claimants were entitled to recover, and on May 8, 1893, entered judgment in their favor for the sum of four thousand one hundred and eighty-five $\frac{98}{100}$ dollars. From this judgment an appeal was taken and allowed to this court.

*Mr. Assistant Attorney Gorman* and *Mr. Assistant Attorney General Dodge* for appellants.

If a tenant for life neglects or refuses to pay the taxes, a receiver may be appointed to take so much of the rent as is necessary for that purpose and to discharge that obligation. *Cairns* v. *Chabert*, 3 Edw. Ch. 312.

It is thoroughly settled that a tenant for life cannot purchase at a tax sale, nor acquire an interest adverse to the reversioner or remainderman by obtaining an assignment of the tax-title. *Phelan* v. *Boylan*, 25 Wisconsin, 679; *Varney* v. *Stevens*, 22 Maine, 331; *Prettyman* v. *Walston*, 34 Illinois, 175–191; *Olleman* v. *Kelgore*, 52 Iowa, 38; *Patrick* v. *Sherwood*, 4 Blatchford, 112; *Arnold* v. *Smith*, 3 Bush, 163;

*Stovall* v. *Austin*, 16 Lea (Tenn.), 700; *Stewart* v. *Matheny*, 66 Mississippi, 21. .

It is entirely unnecessary, however, to multiply authorities on the subject. As was said by Judge Cooley and approvingly quoted by this court in *Lamborn* v. *County Commissioners, supra*, "the principle is universal, and is so entirely reasonable as scarcely to need the support of authorities"; or, as was said by the Court of Claims in *Chaplin* v. *United States*, 29 C. Cl. 231, "the authorities are abundant and are all one way."

Of course there can be no question but that the term "owner" as used in the act applies to the life tenant. Under the decisions of the Court of Claims the term is held to embrace all persons who have any estate in the property. *Rodgers's case*, 21 C. Cl. 130; *Elliott's case*, 20 C. Cl. 328; *Cuthbert's case*, 20 C. Cl. 172.

It is apparent, then, that when this life tenant, Thomas R. S. Elliott, repurchased the real estate in question from the United States, it was a purchase for the benefit of the respondents, the remaindermen. It follows that the property having been purchased from the United States "by the owner or those under whom he claims," the respondents are by the terms of the first proviso of section 4 of the act of March 2, 1891, expressly inhibited from recovery, and that the judgment rendered in their favor was erroneous.

*Mr. James Lowndes* for appellees.

Mr. Justice Shiras, after stating the case, delivered the opinion of the court.

The act of February 6, 1863, c. 21, 12 Stat. 640, provided for the collection of direct taxes in insurrectionary districts within the United States, by subjecting lands, on which such taxes had been assessed and remained unpaid, to public sale to the highest bidder for a sum not less than the taxes, penalty and costs, and ten per centum per annum on said tax. The act contained a provision that the tax commissioners should be authorized to bid in such lands for the United States at a

sum not exceeding two thirds of the assessed value thereof, unless some person should bid a larger sum. It also gave a right of redemption to minors, non-resident aliens, loyal citizens beyond seas, guardians or trustees of persons under legal disabilities at any time within two years of such sale.

The land of the claimants was sold on March 3, 1863, and bid in by the United States for the sum of eleven hundred dollars. Subsequently, November 1, 1866, the United States sold at public auction that portion of its land described as lot A to T. R. S. Elliott for two hundred dollars, and the same was conveyed to him. Said Elliott died in 1876. During his lifetime the land was seized under execution as his property and sold, and never afterwards came into his possession or that of the claimants.

The act of March 2, 1891, c. 496, 26 Stat. 822, provided for the return to the owners of lands bid in for taxes and subsequently resold of any excess received by the United States beyond the amount of the tax assessed thereon, and also for a certain rate of compensation to the owners of property sold for direct taxes. The fourth section of that act contained the following:

"That it shall be the duty of the Secretary of the Treasury to pay to such persons as shall in each case apply therefor and furnish satisfactory evidence that such applicant was at the time of the sales hereinafter mentioned the legal owner, or is the heir at law or devisee of the legal owner of such lands as were sold in the parishes of St. Helena and St. Luke in the State of South Carolina, under the said acts of Congress, the value of said lands, in the manner following, to wit: To the owners of the lots in the town of Beaufort, one half of the value assessed thereon for taxation by the United States direct tax commissioners for South Carolina; to the owners of lands which were rated for taxation by the State of South Carolina as being usually cultivated, five dollars per acre for each acre thereof returned on the proper tax book; to the owners of all other lands, one dollar per acre for each acre thereof returned on said tax book: *Provided,* That in all cases where such owners, or persons claiming under them, have redeemed or

purchased said lands, or any part thereof, from the United States, they shall not receive compensation for such part so redeemed or purchased; and any sum or sums held or to be held by the said State of South Carolina in trust for any such owner under section three of this act shall be deducted from the sum due to such owner under the provisions of this section : *And provided, further*, That in all cases where said owners have heretofore received from the United States the surplus proceeds arising from the sale of their lands, such sums shall be deducted from the sum which they are entitled to receive under this act."

This suit was brought by the appellees in the Court of Claims to assert their claim as the owners in fee simple in remainder of block 91, composed of lots A and B, to $\frac{29}{30}$ths of one half of the value assessed for taxation on said block by the United States direct tax commissioners for South Carolina. The Court of Claims found, among other findings, that the claimants had not repurchased or redeemed any part of lot A from the United States; nor had any purchase been made, intended to be, on their account; and rendered judgment for the claimants in the sum of $4709.22, being $\frac{29}{30}$ths of one half of the assessed value of block 91, less the taxes assessed thereon under the direct tax acts. From so much of this judgment as relates to one half of the assessed value of lot A the United States appealed to this court. There is no controversy as to so much of the judgment as relates to lot B.

The United States do not claim that the appellees, as remaindermen in fee, are not owners, within the meaning of the statute; but they contend that the claimants are within the exclusion of the proviso that in all cases where such owners, or persons claiming under them, have redeemed or repurchased said lands, or any part thereof, from the United States, they shall not receive compensation for such part so redeemed or purchased.

As already stated, the Court of Claims found, as a fact, that the claimants had not redeemed or repurchased any part of lot A, nor had any purchase thereof been made on their account. But this finding is alleged by the United States to

have been based on an erroneous view of the law, that the claimants must be deemed to have repurchased lot A because T. R. S. Elliott, the life tenant, had purchased said lot A at the public sale made by the government in 1866.

The theory of the government is that the life tenant was so far a trustee or representative of the remaindermen that, when he purchased at the public sale in 1866, he acted as well for those in remainder as for himself. To sustain this view the counsel for the United States point to the numerous cases in which it has been held that a tenant for life cannot purchase for himself at a tax sale or acquire an interest adverse to the reversioner or remainderman by obtaining an assignment of the tax title.

Unquestionably, those cases do declare that, as it is the duty of the life tenant to pay the taxes, he cannot, by buying the property at a tax sale or by buying from a purchaser at such sale, take advantage of his own wrong and set up a title so acquired against the remaindermen.

But does the principle of such decisions apply to a case like the present?

That principle is that one whose duty it is to keep the taxes paid cannot, as against those who had a right to rely on his performance of such duty, successfully assert a title originating in his dereliction of duty. In all the cases cited the question was between the life tenant and the remaindermen. In the present case the doctrine is invoked, not in protection of the remaindermen, but to their detriment. The argument is that, because the remaindermen might, by proceeding in equity, have had it declared that the title purchased by the life tenant at the public sale enured to their benefit, it therefore follows that they must be regarded to have been purchasers at said sale, and be now precluded from the benefits of the act of 1891.

An important circumstance is that T. R. S. Elliott did not buy the property at the tax sale in 1863; nor did he buy from an agent or go-between who bought at that sale; nor did he redeem the land under the provisions of the tax law. He bought at the public sale in 1866, the time for redemption

having long expired, when the United States gave a fee simple title, free from encumbrances, to the purchaser. If any one else than the former life tenant had purchased at that sale, it is indisputable that the present claimants would have had a right to recover the money coming to them as owners under the act of 1891. T. R. S. Elliott was under no obligations to bid, and we are unable to see that his doing so changed the relations between the United States and the appellees. If the creditors of T. R. S. Elliott, instead of awaiting his action in possessing himself of the title of the United States to the property, and then seizing it in execution, had themselves bought at the sale, the substantial facts would have been just what they now are. It was found as a fact, by the Court of Claims, that in buying at the auction sale T. R. S. Elliott did not act for or on account of the remaindermen, and we do not feel constrained to extend a doctrine devised for the protection of *cestuis que trustent* so as to operate to their injury.

As, then, the appellees were admittedly owners; as they themselves neither purchased nor redeemed the land; and as they are not held by any necessary intendment of law to have been represented by the actual purchaser, it follows that they are entitled to the benefit of the remedial statute of 1891, and the decree of the Court of Claims to that effect is accordingly

*Affirmed.*